UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

NO. 19- 81700-CIV-MIDDLEBROOKS/BRANNON

HEALTHCARE RESOURCES
MANAGEMENT GROUP, LLC,

    Plaintiff,

v.

ECONATURA ALL HEALTHY
WORLD, LLC, MEDTERRA CBD, LLC,
REJUVENOL LABORATORIES, INC.,
and NOXENO HEALTH SCIENCES, INC.,

    Defendants.
_____/

**MEDTERRA CBD, LLC'S REPLY IN SUPPORT OF THE MOTION TO DISMISS AMENDED COMPLAINT FOR FAILURE TO STATE A CLAIM AND LACK OF PERSONAL JURISDICTION**

Defendant Medterra CBD, LLC ("Medterra") submits this Reply in Support of its Motion to Dismiss Amended Complaint for Failure to State a Claim and Lack of Personal Jurisdiction [D.E. 21], and states as follows:

I.     **Introduction**

When confronted with the prospect that it failed to allege facts that it disclosed the formula for its CBD cream to Medterra, Plaintiff fires a cannon of extraneous arguments that do not plausibly align with facts alleged in the Amended Complaint. In this vein, Plaintiff's core argument is that its allegations of trade secret misappropriation "are not dependent upon 'disclosure' of the actual CBD Cream formula to Medterra." (Resp., at 7.)  Plaintiff makes this strained claim based on language from a comment to the Restatement (Third) of Unfair Competition that "marketing goods that embody the trade secret" may constitute "use" of a trade secret.

Medterra does not dispute that "marketing goods that embody the trade secret" could constitute "use." Using Plaintiff's Coca-Cola analogy (Resp., at 11-12), had Medterra acquired the formula for Coca-Cola and manufactured like products for sale, then Medterra could be liable for "using" the secret formula by "marketing goods that embody the trade secret." If Plaintiff's theory were valid, however, any re-seller of Coca-Cola could potentially be liable for trade secret misappropriation for "marketing goods that embody the trade secret," regardless of whether the re-seller had access to the secret formula. The secret formula is a trade secret; a six-pack of Coke and a six-pack of generic, private label cola for sale at Publix are not.

The Florida Uniform Trade Secrets Act ("FUTSA") and the Defend Trade Secrets Act ("DTSA") both protect improper use of *information*, not improper use of the manufactured end product. Yet, despite Plaintiff's claim that misappropriation may be "premised upon the defendant's commercial 'use' of a product embodying the trade secret via reliance upon a third party" (Resp., at 9), the proposition is unsupported by any of the cases Plaintiff cites. Without plausible allegations that Plaintiff disclosed to Medterra secret information, i.e., the formula, that Medterra "used" to manufacture a CBD cream, Plaintiff's allegations cannot state a claim.

Further, and perhaps more problematic for Plaintiff, is its failure to file any evidence in support of its claim that this Court can exercise personal jurisdiction over Medterra. By declining to file any evidence in rebuttal to Medterra's affidavit of J.P. Larsen, Plaintiff has conceded the truth of the facts set forth in the affidavit. Likewise, because Mr. Larsen's affidavit establishes

1

that Medterra never possessed any secret information constituting a trade secret, and that Medterra never purchased a CBD-infused pain cream that used or incorporated Plaintiff's allegedly proprietary formula, Plaintiff cannot establish the required minimum contacts for this Court to exercise jurisdiction over Medterra.

In sum, for the reasons that follow, the Court should grant Medterra's Motion to Dismiss.

## II.     Argument

### A.     FUTSA and DTSA Protect Improper Use of Information, Not an End Product

Plaintiff argues that it need not allege that Medterra ever possessed the allegedly secret formula for its CBD cream. Instead, Plaintiff argues that its allegations that Medterra's use of Plaintiff's trade secret "facilitated *through someone else* who was under a duty to limit such use" are legally sufficient. (Resp., at 6.) In support, Plaintiff relies on the above-referenced quotation from section 40, comment c., of the Restatement (Third) of Unfair Competition ("marketing goods that embody the trade secret" can constitute "use") and various district court cases within the Eleventh Circuit.

The Eleventh Circuit relied upon this quote from the Restatement in *Penalty Kick Management Ltd. v. Coca Cola Co.*, 318 F.3d 1284 (11th Cir. 2003), where it interpreted Georgia's version of the Uniform Trade Secrets Act. Notably, the parties in *Penalty Kick* did not litigate whether Coca Cola's use of the so-called "magic window" label was facilitated by a third party who was under a duty to keep certain information secret. Instead, the parties litigated whether Coca Cola used or disclosed confidential information the plaintiff had given Coca Cola in the course of negotiations. Though the Eleventh Circuit cited the referenced quote from the Restatement "for guidance," *Penalty Kick* does not stand for the broad proposition that a party's use of the embodiment of the trade secret, i.e., the end product, constitutes "use" of a "trade secret." 318 F.3d at 1292.

A trade secret is, by definition, "information." Fla. Stat. § 688.002(4); 18 U.S.C. § 1839(3). As explained by the California Court of Appeal in interpreting the California Uniform Trade Secrets Act, "The *sine qua non* of a trade secret, then, is the plaintiff's possession of information of a type that can, at the possessor's option, be made known to others, or withheld from them, i.e., kept secret." *Silvaco Data Sys. v. Intel Corp.*, 109 Cal. Rptr. 3d 27, 38 (Cal. Ct. App. 2010), *disapproved on other grounds by Kwikset Corp. v. Superior Court*, 246 P.3d 877, 896 (Cal. 2011). "Use" in trade secret law requires use of *information*, not use of the actual end product:

2

> One clearly engages in the "use" of a secret, in the ordinary sense, when one directly exploits it for his own advantage, e.g., by incorporating it into his own manufacturing technique or product. But "use" in the ordinary sense is not present when the conduct consists entirely of possessing, and taking advantage of, *something that was made* using the secret. **One who bakes a pie from a recipe certainly engages in the "use" of the latter; but one who eats the pie does not, by virtue of that act alone, make "use" of the recipe in any ordinary sense, and this is true even if the baker is accused of stealing the recipe from a competitor, and the diner knows of that accusation**.

*Silvaco*, 109 Cal. Rptr. 3d at 41 (italics in original; bold added). Indeed, Medterra stands in the shoes of the consumer purchasing the pie, "who is accused of stealing the secret recipe because he bought a pie with knowledge that a rival baker had accused the seller of using the rival's stolen recipe." *Id.* at 43. Much like Medterra's purchase of CBD-infused pain cream from EcoNatura, the "customer does not, by buying or eating the pie, gain knowledge of the recipe used to make it." *Id.*; *see also Beacon Wireless Solutions, Inc. v. Garmin Int'l, Inc.*, 894 F. Supp. 2d 727, 733 (W.D. Va. 2012) (interpreting Kansas's Uniform Trade Secrets Act and granting partial summary judgment for defendant on a claim for misappropriation of source code, where the plaintiff never gave "technical details" to the defendant, only the "executable" code); *Election Sys. & Software, LLC v. RBM Consulting, LLC*, No. 11-CV-438, 2015 WL 13484484, at *7-9 (D. Neb. Feb. 4, 2015) (interpreting Nebraska's Uniform Trade Secrets Act and citing *Silvaco* to hold that the use of the end-product software, rather than its source code, i.e., information, cannot constitute misappropriation).

### B. Plaintiff's Authorities Supporting a "Misappropriation by Commercial Use of a Product" Theory are Inapposite

Plaintiff claims that "Eleventh Circuit and Florida law is (sic) replete with examples of misappropriation via unauthorized 'use' of the subject trade secret under similar circumstances." (Resp., at 7.) In all but two of the cases, the defendant had access to and either used or disclosed that secret *information*, but the defendant did not simply use the end product:

- *XTec, Inc. v. Hembree Consulting Services, Inc.*, 183 F. Supp. 3d 1245 (S.D. Fla. 2016): The plaintiff sued the defendant for misappropriation of its software. The trade secret – the software's source code – was stored on a server held by the U.S. Navy. The defendant allowed a third party to access the server and obtain the proprietary source code, and that third party later incorporated the source code into a competitor's product. After a jury verdict for the plaintiff, the defendant argued on a motion for judgment as a matter of law that the third party, not the defendant,

3

"used" the source code. The court denied the motion, noting that misappropriation could be demonstrated through either improper "use" or "disclosure" of a trade secret. Because the jury was instructed to consider whether the defendant "disclosed" the trade secrets, and because the "jury could have reasonably concluded Defendants knew there was proprietary information" on the server "when they provided access," the court declined to consider whether plaintiff proffered sufficient evidence of "use" of the source code. 183 F. Supp. 3d at 1256.[1]

- *Meyn America, LLC v. Tarheel Distributors, Inc.*, 36 F. Supp. 3d 1395 (M.D. Ga. 2014): The plaintiff sued the defendant for misappropriation of machine part blueprints. The plaintiff's former employee took certain blueprints when he was fired, despite having signed a non-disclosure agreement. The former employee provided the blueprints to the defendant, claiming that they were not confidential. On a motion to dismiss, the defendant argued that the plaintiff could not establish that the employee "acquired" the blueprints using "improper means." The court disagreed, concluding that "the facts support a claim for misappropriation at least on the grounds that the Defendants used improper means to acquire the drawings by inducing [the employee] to breach a confidential relationship or duty he owed to the Plaintiff to maintain the drawings' secrecy." 36 F. Supp. 3d at 1408. The issue was whether the defendant "acquired" the blueprints through improper means, not whether it "used" any trade secret.

- *ACR Electronics, Inc. v. DME Corporation*, No. 11-62591-CIV-KAM, 2012 WL 13005955 (S.D. Fla. Oct. 31, 2012): Three former employees of the plaintiff took the plaintiff's proprietary and confidential information when the employees resigned. They then used the plaintiff's information to assist the corporate defendants in producing a competing product. The court concluded, on a motion for a preliminary injunction, that the plaintiff was likely to prevail on its claim for trade secret misappropriation. The corporate defendants possessed the trade secrets and "used" them by paying their employees to exploit the secret information.[2] 2012 WL 13005955, at *11.

- *Pegasus Imaging Corp. v. Allscripts Healthcare Solutions, Inc.*, No. 08-cv-1770-T-30EAJ, 2010 WL 497720 (M.D. Fla. Feb. 9, 2010): The plaintiff provided the source code to

---

[1] Plaintiff's counsel in the case at bar was also the plaintiff's counsel in *XTec*,

[2] The employer would be liable for the employees' tortious conduct under the doctrine of respondeat superior, in any event. *See, e.g., United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1269-74 (11th Cir. 2009).

4

certain software to the defendants' predecessor-in-interest pursuant to a license. Some years later, the license agreement was terminated. Years after the license terminated, the plaintiff told the defendant that it must cease using plaintiff's proprietary source code. Denying the defendant's motion for summary judgment, the court found sufficient evidence that the defendants possessed and used the source code after that use became unauthorized. The defendant possessed and used the source code, not just the end-software product.

While *Del Monte Fresh Produce Co. v. Dole Food Co., Inc.*, 136 F. Supp. 2d 1271 (S.D. Fla. 2001), cited by Plaintiff (Resp., at 8), is closer to Plaintiff's claim that commercial use of an end product may constitute misappropriation of a trade secret, the case is distinguishable. In *Del Monte*, the plaintiffs developed a new variety of pineapple, MD-2, which was sold commercially in the U.S. At some point, the defendants' agent stole one of the MD-2 plants, and the defendants later began selling the MD-2 pineapple in the U.S., labeling it as its own product. The court stated that the MD-2 variety of pineapple, as alleged in the plaintiff's complaint, could at the motion to dismiss stage constitute a trade secret. Nevertheless, the court dismissed the plaintiff's trade secret misappropriation claim, because the plaintiff never specified what specific information (e.g., "genetic code, growth technique, or some other quality") that would be entitled to trade secret protection. 136 F. Supp. 2d at 1293. Put another way, by having stolen the pineapple plant, the defendant acquired this information, because the defendant gained access to the method of production for the MD-2. In contrast, by merely purchasing the end-product MD-2 pineapple from the grocery store – like millions of Americans have done – the defendant would not have had access to the plant's "genetic code" or "growth technique."

Finally, Plaintiff cites a pre-FUTSA Florida case, *Dotolo v. Schouten*, 426 So. 2d 1013 (Fla. Dist. Ct. App. 1983). In that case, the appellees were distributors of citrus-based pet products manufactured by the appellants. After the distributor-manufacturer relationship soured, and the appellants ceased selling products to the appellees. "When the appellees' supply of the secret formulation was no longer available to them from appellants, appellees took samples of appellants formulation to a chemical laboratory and had the samples analyzed . . . ." 426 So. 2d at 1014-15. Using the analysis, the appellees began manufacturing an "imitation" product. *Id.* at 1015. The opinion, however, does not indicate that the appellants ever gave the formula to the appellees. The trial court denied a preliminary injunction, but the appellate court reversed, based on the parties' agreement that the formula would be kept secret. *Id.*

5

The *Dotolo* opinion is an outlier. Courts have long recognized that trade secret protection does not extend to reverse engineering of a product – the action taken by appellees in analyzing a product available on the market. *See, e.g., Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 476 (1974) ("A trade secret law, however, does not offer protection against discovery by fair and honest means, such as by . . . so-called reverse engineering . . . ."). Reverse engineering is not one of the "[i]mproper means" set forth in the statutes. Fla. Stat. § 688.002(1); 18 U.S.C. § 1836(6)(B). As such, *Dotolo* appears to have limited, if any, application under FUTSA and DTSA.

In sum, Plaintiff has offered no controlling authority to support its claim that a commercial use of an end product derived from a trade secret can constitute misappropriation of a trade secret, where the defendant does not have access to the underlying information that is the trade secret. Thus, Plaintiff's scant, conclusory allegation that it gave the secret formula for the CBD cream to Medterra without the "who," "when," "where," or "how" (Am. Compl. ¶¶ 62, 72), requires dismissal of Counts I and II of the Amended Complaint.

      **C.**      **Plaintiff Cannot Rely on its General Allegations to Establish it Maintained the Formula's Secrecy**

Though Plaintiff did not allege that it provided Medterra with any secret information, even assuming that Medterra had "used" Plaintiff's "secret formula" for its CBD Cream, Plaintiff has not adequately alleged its efforts to maintain the secrecy of that formula. Plaintiff argues that it "generally alleged the measures it employed to maintain the secrecy of its CBD Cream formula" at paragraphs 60 and 69 of the Amended Complaint. (Resp., at 10.) Plaintiff also argues that it alleged the "existence of an express or implied confidential business relationship" with Medterra in paragraphs 62 and 72 of the Amended Complaint. (Resp., at 10-11.)

While Medterra concedes the reasonableness of Plaintiff's efforts would be "fact intensive" if adequately alleged, Plaintiff must still make plausible allegations of its "effort" to sustain its pleading burden under Rule 8. Here, Plaintiff rests on its "general allegations" that it "refrained from publicly disclosing" its CBD Cream formula and it "enter[ed] into non-disclosure agreements with its subcontractors and wholesale customers." (Am. Compl. ¶¶ 60, 69.) These general allegations conflict, however, with Plaintiff's more specific allegations, e.g., Plaintiff alleges that Medterra never entered into any non-disclosure agreement. (Am. Compl. ¶ 36.)

Further, although Plaintiff sprinkles the Amended Complaint with the word "proprietary" (*see, e.g.* Am. Compl. ¶¶ 18-20, 22, 34, 56, 59, 68), Plaintiff does not allege plausible facts that it

6

ultimately required Medterra to "refrain from publicly disclosing" anything. *See Sepro Corp. v. Fla. Dep't of Env. Protection*, 839 So. 2d 781, 783 (Fla. Dist. Ct. App. 2003) (holding that producing information without identifying what portions are confidential "effectively destroys any confidential character it might otherwise have enjoyed as a trade secret"); *see also M.C. Dean, Inc. v. City of Miami Beach*, 199 F. Supp. 3d 1349, 1353 (S.D. Fla. 2016) (noting that "[d]isclosing the 'information to others who are under no obligation to protect the confidentiality of the information defeats any claim that the information is a trade secret'") (citation omitted).

Plaintiff also claims that it alleged the existence of a "confidential business relationship" with Medterra because it pled the phrase "confidential business relationship" in paragraphs 62 and 72 of the Amended Complaint.[3] (Resp., at 11.) "Conclusory allegations that a confidential or fiduciary relationship existed, without any supporting factual assertions, are insufficient." *Am. Honda Motor Co., Inc. v. Motorcycle Info. Network, Inc.*, 390 F. Supp. 2d 1170, 1180 (M.D. Fla. 2005). Plaintiff's reliance on a "confidential business relationship" is questionable, in any event. *See Yellowfin Yachts, Inc. v. Barker Boatworks, LLC*, 898 F.3d 1279, 1300 (11th Cir. 2018) ("Although 'Florida law recognizes implied confidential relationships sufficient to trigger trade secret liability,' this Court is 'wary of any trade secret claim predicated on the existence of' such a relationship.") (citation omitted); *In re Dippin' Dots Patent Litig.*, 249 F. Supp. 2d 1346, 1376-77 (N.D. Ga. 2003) (noting the Kentucky "Uniform Act will not imply a confidential relationship between parties"); *Taylor Woodrow Homes Fla., Inc. v. 4/46-A Corp.*, 850 So. 2d 536, 541 (Fla. Dist. Ct. App. 2003) ("When the parties are dealing at arm's length, a fiduciary relationship does not exist because there is no duty imposed on either party to protect or benefit the other.").

Absent plausible allegations that Plaintiff took affirmative steps to keep its CBD Cream formula secret, Counts I and II should be dismissed.

---

[3] Plaintiff likewise claims that it "emphasized" to Medterra that the formula was "proprietary" in paragraphs 22 and 34. Paragraphs 22 and 34 are not as clear as Plaintiff would lead the Court to believe, nor do allegations of a "proprietary" formula give rise to a confidential relationship. *See Doe v. Evans*, 814 So. 2d 370, 374 (Fla. 2002) (describing the elements of a fiduciary relationship).

### D. The Gist of Plaintiff's FDUTPA Claim is Medterra's Purported "Use" of its Secret Formula, Requiring its Dismissal Under Section 688.008, Florida Statutes

Plaintiff argues that Medterra "dramatically misconstrued the factual basis alleged for count III" in arguing that Count III is preempted by FUTSA. (Resp., at 12.) Plaintiff claims to have alleged "specific misconduct" that is "materially distinct from that underlying its amended count I." (Resp., at 13.) Tort claims are preempted by FUTSA when there is no "material distinction" between the FUTSA claim and the tort claim. *Sentry Data Sys., Inc. v. CVS Health*, 361 F. Supp. 3d 1279, 1294-95 (S.D. Fla. 2018).

Of the three examples of "conduct" that Plaintiff cites as "material distinctions," two of those examples involve Plaintiff's own conduct: Plaintiff's "emphasis to EcoNatura and NoXeno that Medterra was a preexisting client" (Am. Compl. ¶ 80); and Plaintiff's "emphasis to Medterra" that Medterra should copy Plaintiff on correspondence (Am. Compl. ¶ 81). How Plaintiff's own conduct makes the torts "materially distinct" is not clear.

As for the third example, Plaintiff contends that the wrongful conduct was Medterra's formation of a "competing business relationship." That business relationship was, nevertheless, "premised upon the continued utilization of Plaintiff's CBD Cream formula" – a factual allegation which also forms the crux of, and is inextricably intertwined with, Plaintiff's FUTSA claim, given Plaintiff's reliance on the "commercial use facilitated by another" theory.[4] (Am. Compl. ¶ 82.)

In sum, because Plaintiff's FDUTPA and FUTSA claims involve the same underlying allegations of wrongdoing by Medterra, Plaintiff's FDUTPA claim is preempted by FUTSA.

### E. Plaintiff Has Failed to Carry Its Burden to Establish Personal Jurisdiction Over Medterra

In response to the Motion to Dismiss, Plaintiff filed no evidence to counter Medterra's Affidavit of J.P. Larsen ("Larsen Affidavit"). Instead, Plaintiff argues that the Larsen Affidavit "does not conclusively refute the fundamental allegations of the amended complaint and is

---

[4] *XTec* does not aid Plaintiff's cause. While the court ultimately found after trial that the FDUTPA claim was not preempted by the plaintiff's FUTSA claim, the court rejected the plaintiff's proffered "material distinction." That the plaintiff "wrongfully solicited" a third party to use the trade secrets "would be insufficient to distinguish the FDUTPA claim from the FUTSA claim, as Defendants' solicitation of [the third party] was only wrongful because it was done with the intent to misappropriate" the trade secrets. *See* 183 F. Supp. 3d at 1263. As a result of clarification and amendment of the plaintiff's theory during the trial in *XTec*, however, the court concluded that the claim was distinct.

therefore ineffective to shift the burden to HCRMG to establish jurisdictional evidence in support of its claims." (Resp., at 18.).

Contrary to Plaintiff's characterization of the Larsen Affidavit, however, Mr. Larsen attested: (a) that Medterra never "used" the CBD Cream formula because the company never received that secret information; and (b) that Medterra never purchased Plaintiff's CBD Cream because it was "generally substandard." (Larsen Aff. ¶¶ 12-15, 19.) The Larsen Affidavit, therefore, establishes that Medterra did not "use" any secret formula, nor did it purchase a product that "embodies" that formula. In other words, the Larsen Affidavit negates an essential element of Plaintiff's misappropriation claim, i.e., its unsworn allegation that Medterra "used" the secret formula.

By failing to proffer any rebuttal evidence, Plaintiff has failed to carry its "burden of establishing a prima facie case of jurisdiction" over Medterra. *Morris v. SSE, Inc.*, 843 F.2d 489, 492 (11th Cir. 1988). Where, as here, the defendant raises "a meritorious challenge to personal jurisdiction" by filing affidavits containing competent evidence, the burden shifts to the plaintiff "to prove jurisdiction by affidavits, testimony or documents." *Internet Solutions Corp. v. Marshall*, 557 F.3d 1293, 1295 (11th Cir. 2009) (citations omitted).

"But, when the plaintiff offers no competent evidence to the contrary, a 'district court may find that the defendant's unrebutted denials [are] sufficient to negate plaintiff's jurisdictional allegations.'" *Serra-Cruz v. Carnival Corp.*, 400 F. Supp. 3d 1354, 1357 (S.D. Fla. 2019) (citation omitted); *see also United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1282 (11th Cir. 2009) (holding that the plaintiff failed to establish personal jurisdiction over a defendant because the plaintiff "failed to rebut with competent evidence" the defendant's specific denials of the relevant conduct).

When a plaintiff relies on section 48.193(1)(a)2., Florida Statutes, as its basis for jurisdiction over a non-resident defendant causing injury in Florida, and that defendant rebuts by affidavit the specific wrongful conduct alleged to have caused injury in Florida, the defendant demonstrates that the claims "do not arise" out of contacts with Florida. *See, e.g., USA Mgm't Grp, LLC v. Fitness Publications, Inc.*, No. 14-22477-CIV-SCOLA, 2015 WL 11233075, at *3 (S.D. Fla. Mar. 4, 2015) (finding that the plaintiff failed "to establish that the litigation is based on" the defendant's activities in Florida where the defendant's affidavit "rebutted" the allegedly wrongful conduct). Through the Larsen Affidavit, Medterra has negated the specific, wrongful

9

acts Plaintiff accuses it of committing. Because Plaintiff has failed to present any counterevidence, however, Plaintiff fails to carry its burden.

Plaintiff's cited authority is inapplicable, because in each of those cases, the defendant's cited evidence did not negate the allegations of tortious conduct in the complaint. *See Macrotrend Capital Group, Inc. v. Edwards*, No. 18-61327-CIV-WPD, 2019 WL 2106421, at *7 (S.D. Fla. Mar. 4, 2019) (relying on "unrebutted allegations" in the complaint, the court found that all of the plaintiff's claims arose out of the defendant's contacts with Florida); *Inetianbor v. Cashcall, Inc.*, No. 13-60066-CIV-COHN, 2016 WL 4250644, at *9 (S.D. Fla. Apr. 5, 2016) (denying motion to dismiss where the plaintiff did not file counter-affidavits in response but cited "previously filed evidence" to rebut the defendant's affidavits); *Mighty Men of God, Inc. v. World Outreach Church of Murfreesboro, Tenn., Inc.*, 102 F. Supp. 3d 1264, 1272 (M.D. Fla. 2015) (denying a motion to dismiss where "[t]he evidence submitted in support of Defendants' Motion to Dismiss does not refute the accuracy" of the plaintiff's allegations of tortious conduct directed at Florida); *Commodores Ent. Corp. v. McClary*, 2015 WL 1242818, at *4 (M.D. Fla. Mar. 18, 2015) (noting that the defendant's evidence filed with his motion to dismiss was limited to "an affidavit which merely stated that he does not regularly conduct business or have offices in Florida").

Further, delaying a ruling on Medterra's Motion to Dismiss will serve no meaningful purpose here. Plaintiff did not cite the need to take jurisdictional discovery, nor did it attempt to contest the facts cited in the Larsen Affidavit. While deferring the resolution of the personal jurisdiction issue pursuant to Rule 12(i) might be prudent where the Court is required to reconcile evidence going to the merits of the case, such is not the case here where Plaintiff has not contested Medterra's evidence. *See, e.g., Sierra Equity Grp., Inc. v. White Oak Equity Partners, LLC*, 650 F. Supp. 2d 1213, 1223-24 (S.D. Fla. 2009) (deferring ruling on jurisdictional issues where the evidence supplied by the parties was in conflict "until a decision on the merits can be reached").

### III.   Conclusion

For the reasons stated in Medterra's Motion to Dismiss [D.E. 21] and in this Reply, Medterra asks this Court to grant the Motion to Dismiss and to dismiss Medterra from this case.

                **MCCABE RABIN, P.A.**
                1601 Forum Pl., Ste. 201
                West Palm Beach, FL 33401-8102
                Office: 561-659-7878

                By: /s/ Robert C. Glass
                Adam T. Rabin
                arabin@mccaberabin.com
                Florida Bar No. 985635
                Robert C. Glass
                Florida Bar No. 052133
                rglass@mccaberabin.com

                *Counsel for Defendant MedTerra CBD, LLC*

## CERTIFICATE OF SERVICE

    I HEREBY CERTIFY that on March 13, 2020, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of a Notice of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

/s Robert C/ Glass
Robert C. Glass, Fla. Bar No. 052133

SERVICE LIST

Healthcare Resources Management Group, LLC

v.

Econatura All Healthy World, LLC, *et al.*

U.S. District Court, Southern District of Florida
No. 9:19-CV81700-DMM/DLB

Eduardo I. Rasco
eir@rrrlaw.com
Steve Michael Bimston
smb@rrrlaw.com
Rosenthal Rosenthal Rasco LLC
20900 N.E. 30th Avenue, Ste. 600
Aventura, FL 33180
*Counsel for Plaintiff*

Adam T. Rabin
arabin@mccaberabin.com
e-filing@mccaberabin.com
Robert C. Glass
rglass@mccaberabin.com
McCabe Rabin, P.A.
1601 Forum Place, Ste. 201
West Palm Beach, FL 33401
561.659.7878
*Counsel for MedTerra CBD, LLC*

Eric Lee
lee@leeamlaw.com
Lee & Amtzis, P.L.
5550 Glades Road, Ste. 401
Boca Raton, FL 33431
561.981.9988
*Counsel for Rejuvenol Laboratories, Inc.*

Barry E. Witlin
barrywitlin@gmail.com
witlinlaw@gmail.com
Barry W. Witlin, P.A.
7805 SW 6th Court
Plantation, FL 33324
*Counsel for Econatura All Healthy World, LLC*
*and Noxeno Health Sciences, Inc.*

13