UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 9-19-cv-81700-Civ-MIDDLEBROOKS/BRANNON

HEALTHCARE RESOURCES MANAGEMENT
GROUP, LLC, a Florida limited liability company,

      Plaintiff,

vs.

ECONATURA ALL HEALTHY WORLD, LLC, a
foreign limited liability company, MEDTERRA
CBD, LLC, a foreign limited liability company,
REJUVENOL LABORATORIES, INC., a foreign
corporation, and NOXENO HEALTH SCIENCES,
INC., a foreign corporation,

      Defendants.

_____/

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTIONS FOR ATTORNEYS' FEES AND COSTS

Plaintiff, HEALTHCARE RESOURCES MANAGEMENT GROUP, LLC ("Plaintiff"), by and through undersigned counsel, hereby files this Response in Opposition to Defendants' Motions for Attorneys' Fees and Costs [ECF No. 58] and [ECF No. 59] (collectively the "Motions for Fees") and in support thereof states as follows:

### ARGUMENT

Defendants' Motions for Fees are premised upon the Florida Uniform Trade Secrets Act ("FUTSA"). *See* [ECF 058 at 4] and [ECF 059 at 3]. Under the FUSTA, a defendant is able to seek "reasonable attorney's fees" if, and only if, (i) the defendant is actually a "prevailing party" ***and*** (ii) the "claim of misappropriation [of trade secrets] is made in bad faith." *See* Fla. Stat. § 688.007. Defendants' Motions for Fees fail both of the foregoing tests as a matter of law.

To the extent that Defendants' Motions for Fees are not outright denied as a matter of law, an award of attorneys' fees under the FUSTA could not be entered without an evidentiary hearing.  In particular, Defendants must prove, through admissible evidence, that Plaintiff's Amended Complaint constitutes "bad faith" under the FUSTA.  *See* Fla. Stat. § 688.007.  Absent an evidentiary showing of "bad faith," as construed under applicable law, an award of attorneys' fees would be improper even if Defendants were somehow found to be "prevailing parties."[1]

Defendants' Motion for Fees fail on each of the aforementioned requirements.  As a result, the Court should deny the Motions for Fees or, at a minimum, deferring ruling until a true "prevailing party" status has been established on the merits.

## I.   DEFENDANTS ARE NOT ENTITLED TO FEES BECAUSE THEY ARE NOT PREVAILING PARTIES

Of the utmost and central importance is the fact that no "prevailing party" has yet to be established in this litigation.  Although the Court entered an Order dismissing Plaintiff's Amended Complaint ***without prejudice***, all of Plaintiff's causes of action have been properly refiled before this same Court.  *See* 9:20-cv-81501 at [ECF 001] (wherein said Complaint is identified as a "related/refiled case" to the above captioned litigation).[2]  Because Plaintiff's

---

[1] A defendant can only seek fees under the FUTSA if the defendant is found to be a bona fide "prevailing party" and if the plaintiff is found to have filed its claims in "bad faith."  To establish "bad faith" under FUTSA, the opposing party must establish that:

> *(1) that plaintiff's claims were objectively specious or frivolous, and (2) that there is evidence of subjective misconduct. "Objective misconduct exists where there is a complete lack of evidence supporting Plaintiff's claims." "Subjective misconduct exists where a plaintiff knows or is reckless in not knowing that its claim for trade secret misappropriation has no merit." Subjective misconduct may be proven by direct evidence of actual knowledge or may be "inferred from the speciousness of plaintiff's trade secret claim and its conduct during litigation." See Knights Armament Co. v. Optical Sys. Tech., Inc., 6:07-CV-1323-ORL, 2012 WL 3932863, at \*4-5 (M.D. Fla. Aug. 20, 2012).*

[2] A copy of the refiled Complaint and Civil Cover Sheet, which identifies it as a "related/refiled case" to the above captioned matter is attached hereto as Composite Exhibit "A."

causes of action are still valid, and are indeed now pending before this Court, there cannot be a determination that any party is or is not presently a "prevailing party." *See Ffrench v. Ffrench*, 418 F. Supp. 3d 1186 (S.D. Fla. 2019) ("dismissals without prejudice in general, usually do not qualify parties for prevailing party status.") (*citing Interim Healthcare Inc. v. Suncoast Loving Care, LLC*, No. 18-60766, 2018 WL 6620314, at *3 (S.D. Fla. Nov. 28, 2018)).

## II.     DEFENDANTS CLAIMS ARE NOT BAD FAITH CLAIMS UNDER FUTSA

Even if one or more of the Defendants were to somehow be deemed "prevailing parties," which would be improper, an award of attorneys' fees under the FUSTA would still be improper at this time because Defendants have failed to establish that Plaintiff's trade secrets claim was made in "bad faith." *See* Fla. Stat. § 688.007.

To establish "bad faith" under FUSTA, the Defendants would have to prove "(1) that plaintiff's claims were objectively specious or frivolous, ***and*** (2) that there is evidence of subjective misconduct." *See Knights Armament Co. v. Optical Sys. Tech., Inc.*, 6:07-CV-1323-ORL, 2012 WL 3932863, at *4-5 (M.D. Fla. Aug. 20, 2012) (emphasis added).

There is no evidence that Plaintiff's claims, which survived a motion to dismiss and are not again pending before this Court, were "were objectively specious or frivolous…." *See* 9:20-cv-81501 at [ECF 001] .

Moreover, there is no evidence of any "subjective misconduct" on the part of the Plaintiff.  At worst, Plaintiff was subjected to a withdrawal of its legal counsel during a pandemic and, as a result thereof, was unable to secure replacement legal counsel as quickly as Plaintiff would have preferred.  Plaintiff's delay in securing legal counsel during the present pandemic should not result in a finding of "subjective misconduct" under the FUSTA. Delays in locating and obtaining legal counsel, especially during the present pandemic, cannot reasonably constitute "subjective misconduct."  Legal citations for the foregoing

proposition are not readily available, but because the recent unprecedent events relating to Covid-19 make it impossible to find any such precedents.

As a result, even if there was a "prevailing party," which there is not, Defendants are not entitled to an award of attorneys' fees because there is no legal showing of "bad faith."

### III.   IF THE MOTIONS FOR FEES ARE NOT DENIED OUTRIGHT, THE MOTIONS SHOULD BE DEFERRED OR AN EVIDENTIARY HEARING IS NECESSARY AS TO THE ISSUE OF PURPORTED "BAD FAITH"

As addressed above, Defendants Motions for Fees should be denied at this time because, as a matter of law, (i) there is no "prevailing party" and (ii) there is no "bad faith" on the part of Plaintiff.  As a result, the Motions for Fees should be denied or, at a minimum, any ruling should be deferred until the substantive litigation is completed in the recently refiled matter. See 9:20-cv-81501 at [ECF 001].

To the extent that the Motions for Fees are not denied or deferred, any award of fees under the FUSTA would be improper without an evidentiary hearing on the issue of purported "bad faith."  As a result, if this Court does not deny or defer as to the Motions for Fees pursuant to the FUSTA, the Court should conduct an evidentiary hearing regarding the issue of, *inter alia,* purported "bad faith."

**WHEREFORE**, Plaintiff, HEALTHCARE RESOURCES MANAGEMENT GROUP, LLC, respectfully requests that this Court enter an Order (i) Denying, with or without prejudice, the Motions for Fees ([ECF No. 58] and [ECF No. 59]); (ii) to the extent the Motions for Fees are not denied outright, setting procedures and deadlines for an evidentiary hearing on the issue of purported "bad faith;" and (iii) granting such other relief as is just and proper.

Dated: September 4, 2020.                    Respectfully submitted,

                                       **HIRZEL DREYFUSS & DEMPSEY PLLC**
                                       *Counsel for Plaintiff*
                                       2333 Brickell Ave, Suite A-1
                                       Miami, Florida 33129-2497
                                       Telephone: (305) 615-1617
                                       Facsimile: (305) 615-1585

                                   By: */s/  Patrick G. Dempsey*
                                       **LEON F. HIRZEL**
                                       Florida Bar No. 085966
                                       hirzel@hddlawfirm.com
                                       **PATRICK G. DEMPSEY**
                                       Florida Bar No. 27676
                                       dempsey@hddlawfirm.com

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that a copy of the foregoing was served via CM/ECF Notification to all parties registered to receive electronic notice on this 4th day of September, 2020.

                                   By: */s/  Patrick G. Dempsey*
                                       **PATRICK DEMPSEY**

# Composite Exhibit "A"

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO.

HEALTHCARE RESOURCES MANAGEMENT
GROUP, LLC, a Florida limited liability company,

      Plaintiff,

vs.

ECONATURA ALL HEALTHY WORLD, LLC, a
foreign limited liability company, MEDTERRA
CBD, LLC, a foreign limited liability company,
REJUVENOL LABORATORIES, INC., a foreign
corporation, and NOXENO HEALTH SCIENCES,
INC., a foreign corporation,

      Defendants.

_____/

## **COMPLAINT**

Plaintiff, HEALTHCARE RESOURCES MANAGEMENT GROUP, LLC ("HCRMG"), by and through undersigned counsel, hereby sues Defendants, ECONATURA ALL HEALTHY WORLD, LLC ("EcoNatura"), MEDTERRA CBD, LLC ("Medterra"), REJUVENOL LABORATORIES, INC. ("Rejuvenol"), and NOXENO HEALTH SCIENCES, INC. ("NoXeno"):

## **JURISDICTION, PARTIES AND VENUE**

1) This is an action for misappropriation of trade secrets pursuant to the Florida Uniform Trade Secrets Act, Florida Statutes §688.001 *et seq.* as well as the Defend Trade Secrets Act, 18 U.S.C. §1836 *et seq.*; violations of the Florida Deceptive and Unfair Trade Practices Act, Florida Statutes §501.201 *et seq.*; and tortious interference with a business relationship, in which the respective parties' citizenship is

diverse and the amount in controversy exceeds $75,000. This Court therefore has diversity subject matter jurisdiction pursuant to 28 U.S.C. §1332 , as well as original jurisdiction pursuant to 18 U.S.C. §1836(c) along with supplemental jurisdiction pursuant to 28 U.S.C. §1367.

2)      Plaintiff, HCRMG, is a Florida limited liability company with its principal place of business in Palm Beach County, Florida. The members of HCRMG consist of Sam Genovese and Mercy Romero, both of whom are citizens and residents of Florida.

3)      Defendant, EcoNatura, is a Delaware limited liability company with its principal place of business in Collier County, Florida. The members of EcoNatura consist of Richard and Jama Russano, both of whom are, upon information and belief, citizens of New York. This Court possesses personal jurisdiction over EcoNatura because such Defendant committed tortious acts causing injury to Plaintiff within Florida, and because EcoNatura conducts substantial and not isolated activity within Florida.

4)      Defendant, Medterra, is a California limited liability company with its principal place of business in Orange County, California. The members of Medterra consist of J.P. Larsen, John "Jay" Hartenbach, and Chaz Owens, all of whom, upon information and belief, are citizens and residents of California. This Court possesses personal jurisdiction over Medterra because such Defendant committed tortious acts causing injury to Plaintiff within Florida.

5)      Defendant, Rejuvenol, is a New York corporation with its principal place of business in Suffolk County, New York. This Court possesses personal jurisdiction over Rejuvenol because such Defendant committed tortious acts causing injury to

Plaintiff within Florida.

6) Defendant, NoXeno, is a Delaware corporation with its principal place of business in New Castle County, Delaware. This Court possesses personal jurisdiction over NoXeno because such Defendant committed tortious acts causing injury to Plaintiff within Florida.

7) Venue is proper in this Court pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred within this judicial district including, without limitation: electronic communications originated within this district by which the subject trade secrets were obtained by the Defendants; payments were made to Plaintiff within this district pursuant to the subject business relationship; and Plaintiff suffered substantial harm within this district as a result of the Defendants' misconduct to be detailed below.

## GENERAL ALLEGATIONS

8) Plaintiff HCRMG is a leading producer of pharmaceutical-grade hemp products intended for the healthcare and veterinary markets. HCRMG formulates its own proprietary blend of ingredients for use in various products including sublingual oils (i.e., taken orally and applied under the tongue), gelcaps, dissolvable tablets, gummies and muscle creams. Although HCRMG sells and markets its products under its own Pharmalieve™ brand, it also produces similar hemp products for various distributors on a "white label" basis. HCRMG contracts with third-party production facilities to manufacture the products it sells and distributes.

9) All of HCRMG's products include compounds derived from industrial hemp. Hemp is a distinct strain of the *Cannabis sativa* plant with a lower concentration

of delta-9 tetrahydrocannabinol ("THC") – the active ingredient in marijuana known for its psychoactive effects on users. Although hemp contains a lower concentration of THC, it contains higher amounts of cannabidiol ("CBD") which is a non-psychoactive ingredient believed to have various beneficial effects including pain relief, reduction of anxiety and as a sleep aid. All of HCRMG's products contain a THC concentration of no more than 0.3 percent on a dry weight basis and are incapable of producing psychoactive effects.

10)    As of December 20, 2018, all hemp and hemp-derived products containing a THC concentration of not more than 0.3 percent on a dry weight basis have been de-scheduled from the Controlled Substances Act of 1970, 21 U.S.C. ch.13, §801 *et seq.*, pursuant to the Agriculture Improvement Act of 2018, Public Law no. 115-334.

11)    Similarly, hemp and hemp-derived cannabinoids containing a THC concentration of no more than 0.3 percent on a dry weight basis are not considered controlled substances under Florida law as per Florida Statutes §581.217.

12)    In or around August of 2017, HCRMG was introduced to EcoNatura through one of HCRMG's customers.

13)    As of such time frame, HCRMG was utilizing a factory in Arizona to manufacture a CBD-based pain cream intended for topical application to reduce muscle soreness and joint pain. Upon being introduced to EcoNatura, one of EcoNatura's principals and owners – Jama Russano ("Russano") – advised HCRMG that EcoNatura had extensive experience with manufacturing creams and lotions and that it could reformulate HCRMG's pain cream into a superior product. Nevertheless, EcoNatura had no prior experience with producing or manufacturing CBD-based or other hemp-

derived products.

14)     EcoNatura manufactures its products through a laboratory and production facility located in New York which is owned and operated by Defendant Rejuvenol.

15)     Upon meeting Russano, Sam Genovese ("Genovese") - one of the principals and owners of HCRMG – discussed the prospect of entering into a joint venture relationship with EcoNatura for the production and distribution of CBD-based products. These discussions contemplated the merger of EcoNatura and another entity with which Genovese was involved – FoxFire Edibles, LLC ("FoxFire") – into Defendant NoXeno as a parent company. The intent behind the planned NoXeno joint venture was to assemble a team of individuals and entities with expertise in all aspects of the burgeoning cannabis industry including growing, cultivation, extraction and blending into a variety of CBD-based products for marketing and sale through various retail and online channels.

16)     On or about January 25, 2018, Genovese on behalf of FoxFire and Russano on behalf of EcoNatura and NoXeno executed a Mutual Non-Disclosure Agreement (the "NoXeno NDA") which, among other terms, obligated the respective parties to refrain from using or disclosing to third parties any "Confidential Information" exchanged under the terms of the NoXeno NDA outside of the parties' intended joint venture relationship. The NoXeno NDA expressly defined "Confidential Information" to include, without limitation: "information relating to the Disclosing Party's products, operations, processes, plans or intentions, product information, know-how, design rights, trade secrets, market opportunities, business plans, pricing,

marketing strategies, and business affairs." Although HCRMG was not a party to the NoXeno NDA, Russano and Genovese discussed and contemplated rolling HCRMG's Pharmalieve™ product line into the NoXeno joint venture in order to legitimize the venture to prospective investors using HCRMG's proven track record of generating revenue with its Pharmalieve™ products.

17)     Shortly after the execution of the NoXeno NDA, HCRMG began to work with EcoNatura as of early 2018 for the purpose of reformulating and manufacturing a CBD-based pain cream. Additionally, HCRMG discussed with EcoNatura the possibility of manufacturing other CBD-based items including a roll-on formula as well as a psoriasis cream – the ideas for which were conceived of solely by HCRMG.

18)     Because of the prior execution of the NoXeno NDA, HCRMG felt comfortable exchanging its proprietary and confidential information with EcoNatura and the parties acted as if the NoXeno NDA was applicable to HCRMG's confidential information. Although HCRMG forwarded its own confidentiality and non-circumvent agreement to Russano in January, 2018 for execution by EcoNatura, Russano refused to execute it and advised HCRMG that it was unnecessary since EcoNatura was already a party to the NoXeno NDA and that the NoXeno NDA would apply to any transactions between HCRMG and EcoNatura.

19)     Throughout March and April of 2018, HCRMG transmitted via email from its principal office in Palm Beach County, Florida to EcoNatura at its principal office in Collier County, Florida, various confidential and proprietary information including a wholesale pricing matrix for HCRMG's Pharmalieve™ product line and the ingredient list and formula for HCRMG's CBD-based pain cream ("CBD Cream") to be produced by

EcoNatura and manufactured by Rejuvenol. HCRMG initially intended to market the CBD Cream under its own Pharmalieve™ brand, and Genovese continued to discuss with Russano rolling the CBD Cream – along with the remainder of the Pharmalieve™ product line –into the NoXeno joint venture for purposes of enhancing the appearance of profitability of the venture to prospective investors.

20)     As per their discussions, EcoNatura produced the CBD Cream via starting with HCRMG's proprietary formula as a base and adding some additional ingredients to enhance the texture and viscosity of the product, with the finished product manufactured by Rejuvenol at its New York laboratory. At all times material hereto, Rejuvenol had been advised by HCRMG and was otherwise aware that the CBD Cream it was manufacturing on behalf of HCRMG and EcoNatura was primarily based upon HCRMG's confidential and proprietary formula.

21)     Almost immediately after HCRMG, EcoNatura and Rejuvenol began working together to produce the CBD Cream towards the end of March, 2018, principals of Defendant Medterra contacted HCRMG and inquired about the feasibility of HCRMG producing a CBD-based pain cream to be sold under Medterra's branding. Medterra was an existing client of HCRMG since HCRMG had previously produced CBD-based items for Medterra dating back to mid-2017.

22)     As of the first quarter of 2018, Medterra had already established itself as a recognized brand for hemp products being sold in California. HCRMG therefore advised Medterra in late March, 2018 that it had recently begun production of its proprietary CBD Cream and that HCRMG would be willing to produce the same formula for Medterra on a "white label" basis to enable Medterra to market the CBD

Cream under its own branding.

23)     In or around early April, 2018, HCRMG began forwarding purchase orders for the CBD Cream to EcoNatura on behalf of Medterra as well as other wholesale customers with whom HCRMG was working, in addition to orders intended to be sold directly by HCRMG under its Pharmalieve™ brand. EcoNatura coordinated the manufacturing of the CBD Cream with Rejuvenol and arranged for the product to be packaged, labeled and distributed according to the unique requirements (such as, for example, the size and type of container, labeling and branding) for each order and the customer(s) for whom the order was intended. At all times material hereto, HCRMG would bill its customers for each order of the CBD Cream and, upon receipt of payment at its principal business address, distribute amounts owed to EcoNatura as per its invoices reflecting production and distribution costs. Upon its receipt of such payments, EcoNatura in turn would distribute amounts owing to Rejuvenol.

24)     As of June, 2018, HCRMG was working with EcoNatura and Rejuvenol to produce the CBD Cream on behalf of at least two other wholesale customers *in addition to* inventory being produced for Medterra, *as well as* inventory being produced for HCRMG's Pharmalieve™ brand.

25)     Shortly after HCRMG began producing its CBD Cream through EcoNatura and Rejuvenol, problems began to arise. For example, between June and September of 2018 HCRMG was receiving complaints from Medterra and at least one other wholesale customer about the packaging in which the CBD Cream inventory was distributed. Specifically, HCRMG's wholesale customers were complaining that the CBD Cream was leaking during shipment, thereby compromising the salability of the

8

inventory.

26)    Moreover, the inventory yielded by each production run of the CBD Cream reformulated by EcoNatura and manufactured by Rejuvenol was lower than it should have been considering the volume of base ingredients devoted to each production. This resulted in higher production costs.

27)    HCRMG was also fielding complaints from Medterra as of September, 2018 concerning CBD Cream inventory received from EcoNatura and Rejuvenol with labeling problems which included incorrect volume designations and labels not properly affixed to the containers (i.e., peeling/bubbling, etc.).

28)    Medterra additionally began to raise cost concerns regarding the CBD Cream to HCRMG throughout September, 2018. Medterra advised that it had access to other suppliers willing to produce a similar product for half of the cost of the CBD Cream produced by HCRMG through EcoNatura and Rejuvenol, although Medterra conceded that it believed HCRMG's product to be of superior quality. In response to such concerns, HCRMG emphasized that the total cost was a function of the expenses incurred to obtain, process and blend the individual ingredients into the finished product. However, HCRMG was also aware that the production costs for the CBD Cream were being dictated by EcoNatura and Rejuvenol without substantiation and that HCRMG had no means of independently verifying the legitimacy of such costs.

29)    By September, 2018, HCRMG, EcoNatura and Rejuvenol had produced, manufactured and distributed tens of thousands of individual containers of CBD Cream to Medterra for retail sale to its customers using Medterra's own branding, which containers ranged in quantity from 250-750 milligrams (for individual resale) up to a

gallon (for samples).

30)     Pleased with the quality of the CBD Cream, Medterra began to express interest to HCRMG about production of other hemp-derived products. In September, 2018, Medterra requested contact information from HCRMG for its manufacturing subcontractors in order to directly discuss the possibility of producing a variety of hemp-derived products. HCRMG therefore provided Medterra with Russano's contact information but emphasized that HCRMG needed to be copied on all correspondence between Medterra and EcoNatura.

31)     Throughout the latter part of September and continuing through October, 2018, Medterra began to routinely correspond directly with EcoNatura regarding the formulation of a variety of CBD-based products and Genovese was copied on some, but not all of such correspondence. In certain instances Medterra would send emails requesting feedback on potential new product ideas to Russano on which Genovese was not initially copied, and Russano would respond via email on which she copied Genovese.

32)     On or about November 13, 2018, Medterra emailed Russano to inquire whether EcoNatura was manufacturing the CBD Cream exclusively for Medterra. Neither Genovese nor anyone on behalf of HCRMG was copied on such correspondence.

33)     The following day, Russano replied to Medterra via email in which she copied Genovese and confirmed that HCRMG and EcoNatura "will make this formulation an exclusive for Medterra." However, HCRMG never authorized EcoNatura to represent to wholesale customers that the CBD Cream was exclusively available to any one customer since at that time the same (or a very similar) formulation was being

white-labeled to multiple wholesale customers as well as being sold directly by HCRMG under its Pharmalieve™ brand.

34)     Accordingly, and in an effort to control the potential damage caused by EcoNatura's unauthorized representations, Genovese on November 14, 2018 responded to Medterra via email by indicating that HCRMG would be willing to contract with Medterra to make the CBD Cream an exclusive product if the parties were able to agree upon pricing terms. Genovese specifically reminded Medterra in his November 14th email that the CBD Cream was primarily based upon HCRMG's proprietary formula which was also being used for white labeling and direct retail sales to other customers.

35)     Medterra did not respond to Genovese's November 14th email, but continued to correspond via email with EcoNatura throughout December, 2018 and January, 2019 regarding new purchase orders and ingredient formulations for the CBD Cream. Genovese was copied on some, but not all, of such email correspondence.

36)     Sensing that HCRMG was being increasingly excluded from the ongoing correspondence between Medterra and EcoNatura despite the fact that Medterra was HCRMG's client, Genovese emailed an updated confidentiality and non-disclosure agreement to both Medterra and EcoNatura on January 22, 2019 in order to memorialize the terms of their ongoing business relationship and to protect each entity's intellectual property. Neither Medterra nor EcoNatura executed, or even acknowledged receipt of, the updated agreement.

37)     The following day, Medterra placed a new order via email for more than 80,000 units of the CBD Cream directly with EcoNatura. Neither Genovese nor anyone on behalf of HCRMG was copied on such correspondence.

38)     On February 27, 2019, Medterra sent a new purchase order for the CBD Cream via email to EcoNatura, copying Genovese on behalf of HCRMG. The February 27th purchase order incorrectly designated Rejuvenol, rather than HCRMG, as the vendor.

39)     Later that evening, Genovese replied to Medterra via email in which he explained that the vendor for the CBD Cream was HCRMG and that HCRMG was responsible for processing orders and receiving payments. Genovese therefore requested that Medterra revise the February 27th purchase order to reflect HCRMG as the proper vendor. Medterra did in fact issue a revised purchase order on February 28, 2019 to reflect HCRMG as the vendor.

40)     On March 3, 2019, Genovese on behalf of HCRMG forwarded a subcontractor agreement to Russano on behalf of EcoNatura via email. The subcontractor agreement contained extensive provisions delineating the terms of the contracting relationship between HCRMG and EcoNatura (which by that point had been ongoing for more than one year) as well as protecting each entity's intellectual property. Russano replied the following morning and initially indicated that she would discuss it with her business partner.

41)     However, Russano thereafter did not react favorably to HCRMG's subcontractor agreement and ultimately refused to execute it on behalf of EcoNatura. From that point forward, the business relationship between HCRMG and EcoNatura began to deteriorate.

42)     On March 29, 2019, Genovese emailed Russano concerning a delivery issue with respect to a ground shipment of CBD Cream that was to go directly from

Rejuvenol's laboratory in New York to a customer warehouse in Delray Beach, Florida. Genovese indicated in his March 29th email that the shipment was sent by Rejuvenol without alerting HCRMG or the customer that the shipment was en route, and that HCRMG was able to successfully divert the shipment to an alternate location when Genovese by chance happened to inquire about the shipment to the freight carrier before it was attempted to be delivered. Had the shipment not been timely diverted, the customer would not have had the staff on hand to receive it without prior notice. As a result of this close call, Genovese indicated to Russano that HCRMG would be implementing new procedures for EcoNatura and Rejuvenol to follow with respect to future deliveries.

43)     Russano reacted to Genovese's March 29th email with indignation. Later that morning, she replied to Genovese by indicating that "things happen" and that she "really [doesn't] need a lecture every time something doesn't go perfectly."

44)     HCRMG thereafter attempted to implement clearly-defined procedures for EcoNatura and Rejuvenol to follow with respect to production and distribution of products for HCRMG customers. In connection therewith, HCRMG's co-owner and managing partner, Mercy Romero, emailed Russano on behalf of EcoNatura on April 1, 2019 with various questions concerning the costs involved in producing the CBD Cream through Rejuvenol.

45)     Russano replied later that evening with answers that were evasive and incomplete. Essentially, EcoNatura refused to divulge the basis for the cost of components used to formulate and produce the CBD Cream. HCRMG therefore had no visibility into the production costs and, accordingly, no way of addressing ongoing

HIRZEL DREYFUSS & DEMPSEY, PLLC, 2333 BRICKELL AVENUE, SUITE A-1, MIAMI, FLORIDA 33129

concerns raised by its customers – such as Medterra – that the wholesale cost of the CBD Cream was too expensive.

46)     EcoNatura and Rejuvenol continued to have manufacturing issues with the CBD Cream throughout the month of April, 2019. Specifically, HCRMG took the initiative to have samples of the CBD Cream produced by EcoNatura and manufactured by Rejuvenol tested by an independent laboratory in order to determine whether the finished product contained the correct level of moisture.

47)     HCRMG received the test results on or about April 17, 2019, reflecting that the CBD Cream contained vastly excessive percentages of water which compromised the texture and effectiveness of the finished product, as well as promoted dangerous microbial growth. Upon confronting EcoNatura with the test results, Russano reacted with apathy and recalcitrance.

48)     Realizing that the current trajectory of its business relationship with EcoNatura and Rejuvenol was proving to be unworkable, HCRMG began making arrangements to shift the production and distribution of the CBD Cream to more capable and willing subcontractors.

49)     Nevertheless, Russano included references to HCRMG's Pharmalieve™ product line in NoXeno marketing materials generated in April, 2019 which were intended for prospective investors.

50)     On April 24, 2019, HCRMG emailed Medterra to propose a new pricing structure along with the alternative to maintain the current CBD Cream formula using different manufacturing subcontractors or to slightly modify the formula which Medterra would own outright, also using new manufacturing subcontractors. By

HIRZEL DREYFUSS & DEMPSEY, PLLC, 2333 BRICKELL AVENUE, SUITE A-1, MIAMI, FLORIDA 33129

moving the production and distribution efforts away from EcoNatura and Rejuvenol, HCRMG was confident it could reduce the wholesale cost of the CBD Cream and pass the savings to Medterra and other customers.

51) Medterra acknowledged receipt of the April 24th email, but otherwise did not follow up with or respond to HCRMG.

52) Throughout the month of May, 2019, HCRMG took steps to close out and finalize its remaining invoices with EcoNatura in anticipation of moving the production and distribution of the CBD Cream to different subcontractors.

53) On May 15, 2019, NoXeno sent a letter to Genovese indicating that Genovese's involvement in the NoXeno joint venture was being terminated effective immediately. The May 15th letter criticized Genovese for recently indicating that HCRMG was withdrawing its Pharmalieve™ product line from the joint venture, and NoXeno warned Genovese in the letter that he should "refrain from infringing any intellectual property rights of the group as they will be defended vigorously."

54) Although HCRMG had uniformly and consistently handled the billing and payment arrangements with its clients over the course of the approximately eighteen months it had been working with EcoNatura, on or about June 5, 2019 Russano on behalf of EcoNatura sent a letter directly to Medterra requesting payment of four invoices which were then outstanding. Russano's June 5th letter included an itemization of separate amounts owing to both EcoNatura and HCRMG and furthermore revealed HCRMG's profit margins.

55) Subsequent to Medterra's receipt of Russano's June 5th letter, HCRMG received no further orders from Medterra.

56)     Nevertheless, upon information and belief Medterra continues to sell the CBD Cream produced by EcoNatura and manufactured by Rejuvenol using in substantial part HCRMG's proprietary formula, and the Defendants have reaped hundreds of thousands (if not millions) of dollars from the sale thereof. Moreover, NoXeno has continued to solicit investors using the revenue stream generated by EcoNatura's sales of the CBD Cream (again, based in substantial part upon HCRMG's proprietary formula) to Medterra as a proof of concept. Although HCRMG through counsel has demanded that Medterra, EcoNatura and Rejuvenol cease and desist from the further production and sale of CBD Cream based upon HCRMG's formula, these Defendants have ignored such demands.

57)     All conditions precedent to this action have occurred, been performed, or been waived.

## COUNT I – VIOLATIONS OF THE FLORIDA UNIFORM TRADE SECRETS ACT
### (Florida Statutes §§688.01 *et seq.*)
### (against all Defendants)

58)     Plaintiff hereby reasserts and realleges the allegations contained in paragraphs 1-57 as if fully set forth herein.

59)     The formula for HCRMG's proprietary CBD Cream derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use. Specifically, HCRMG expended substantial time, money and effort in developing the formula for its CBD Cream, the sale of which has generated significant revenue for HCRMG. The CBD Cream formula consists not only of the combination of specific ingredients; it also includes the relative percentages of each

individual ingredient and the manner in which the specific amount of each ingredient gets blended with the remaining ingredients to form the finished product.

60)    HCRMG employs reasonable efforts to maintain the secrecy of its CBD Cream formula, including refraining from publicly disclosing same and entering into non-disclosure agreements with its subcontractors and wholesale customers for whom the formula is white-labeled.

61)    Accordingly, the formula for HCRMG's CBD Cream is a trade secret under Florida law.

62)    By virtue of their express and/or implied confidential business relationship, HCRMG entrusted Medterra, EcoNatura, Rejuvenol and NoXeno with highly sensitive confidential information including, without limitation, the formula for HCRMG's proprietary CBD Cream.

63)    At all times material hereto, each of the Defendants was aware that HCRMG's disclosure to each of them of the formula for the CBD Cream was done strictly in furtherance of the parties' business relationship and that HCRMG never authorized any of the Defendants to use or disclose the formula for HCRMG's CBD Cream other than in furtherance of the confidential business relationship between HCRMG, Medterra, EcoNatura, Rejuvenol and NoXeno.

64)    Medterra, EcoNatura, Rejuvenol and NoXeno misappropriated the formula for HCRMG's CBD Cream by continuing to use same outside of the parameters of any business relationship with HCRMG and without HCRMG's consent, by which the Defendants have reaped significant profits in connection therewith - none of which have been distributed to HCRMG.

HIRZEL DREYFUSS & DEMPSEY, PLLC, 2333 BRICKELL AVENUE, SUITE A-1, MIAMI, FLORIDA 33129

65)     Medterra's, EcoNatura's, Rejuvenol's and NoXeno's misappropriation of the formula for HCRMG's CBD Cream was done willfully and maliciously because all of the Defendants were acutely aware of the highly sensitive and confidential nature of the formula and HCRMG's ownership thereof, and nevertheless proceeded to commercially utilize the formula in order to generate significant profits while purposely excluding HCRMG from such enterprise.

66)     As a direct and proximate result of Medterra's, EcoNatura's, Rejuvenol's and NoXeno's ongoing misappropriation of HCRMG's trade secrets, HCRMG has suffered and continues to suffer substantial damages.

WHEREFORE, Plaintiff respectfully requests entry of a judgment against Medterra, EcoNatura, Rejuvenol and NoXeno awarding damages, injunctive relief, attorneys' fees and costs, pre- and post-judgment interest, and such other and further relief this Court deems just and proper.

## COUNT II – VIOLATIONS OF THE DEFEND TRADE SECRETS ACT
### (18 U.S.C. §§1836 *et seq.*)
### (against all Defendants)

67)     Plaintiff hereby reasserts and realleges the allegations contained in paragraphs 1-57 as if fully set forth herein.

68)     The formula for HCRMG's proprietary CBD Cream derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use. Specifically, HCRMG expended substantial time, money and effort in developing the formula for its CBD Cream, the sale of which has generated significant revenue for HCRMG. The CBD Cream formula consists not only of the

combination of specific ingredients; it also includes the relative percentages of each individual ingredient and the manner in which the specific amount of each ingredient gets blended with the remaining ingredients to form the finished product.

69)     HCRMG employs reasonable efforts to maintain the secrecy of its CBD Cream formula, including refraining from publicly disclosing same and entering into non-disclosure agreements with its subcontractors and wholesale customers for whom the formula is white-labeled.

70)     HCRMG actively sells and/or white labels the CBD Cream for use in interstate commerce.

71)     Accordingly, the formula for HCRMG's CBD Cream is a trade secret under federal law.

72)     By virtue of their express and/or implied confidential business relationship, HCRMG entrusted Medterra, EcoNatura, Rejuvenol and NoXeno with highly sensitive confidential information including, without limitation, the formula for HCRMG's proprietary CBD Cream.

73)     At all times material hereto, each of the Defendants was aware that HCRMG's disclosure to each of them of the formula for the CBD Cream was done strictly in furtherance of the parties' business relationship and that HCRMG never authorized any of the Defendants to use or disclose the formula for HCRMG's CBD Cream other than in furtherance of the confidential business relationship between HCRMG, Medterra, EcoNatura, Rejuvenol and NoXeno.

74)     Medterra, EcoNatura, Rejuvenol and NoXeno misappropriated the formula for HCRMG's CBD Cream by continuing to use same outside of the parameters

of any business relationship with HCRMG and without HCRMG's consent, by which the Defendants have reaped significant profits in connection therewith - none of which have been distributed to HCRMG.

75)     Medterra's, EcoNatura's, Rejuvenol's and NoXeno's misappropriation of the formula for HCRMG's CBD Cream was done willfully and maliciously because all of the Defendants were acutely aware of the highly sensitive and confidential nature of the formula and HCRMG's ownership thereof, and nevertheless proceeded to commercially utilize the formula in order to generate significant profits while purposely excluding HCRMG from such enterprise.

76)     As a direct and proximate result of Medterra's, EcoNatura's, Rejuvenol's and NoXeno's ongoing misappropriation of HCRMG's trade secrets, HCRMG has suffered and continues to suffer substantial damages.

WHEREFORE, Plaintiff respectfully requests entry of a judgment against Medterra, EcoNatura, Rejuvenol and NoXeno awarding damages, injunctive relief, attorneys' fees and costs, pre- and post-judgment interest, and such other and further relief this Court deems just and proper.

## COUNT III – VIOLATIONS OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT (Florida Statutes §§501.201 *et seq.*) (against Medterra, EcoNatura and NoXeno)

77)     Plaintiff hereby reasserts and realleges the allegations contained in paragraphs 1-57 as if fully set forth herein.

78)     HCRMG, Medterra, EcoNatura and NoXeno were engaged in the conduct of a trade or commerce, as defined by Florida Statutes §501.203(8), by virtue of EcoNatura's production of the CBD Cream primarily based upon HCRMG's proprietary

20

formula on behalf of Medterra as a wholesale customer for purposes of enabling Medterra to ultimately resell the CBD Cream to retail customers. The revenues from such sales were touted by NoXeno to prospective investors as a proof of concept for purposes of encouraging outside capital infusion into the NoXeno joint venture.

79)     HCRMG was the architect of its business relationship with Medterra and EcoNatura, since Medterra was an existing client of HCRMG at the time HCRMG retained EcoNatura to produce the CBD Cream on Medterra's behalf and EcoNatura otherwise had no prior experience with production or sales of CBD-based products. Additionally, HCRMG's proven track record of revenue generation with CBD products enabled NoXeno to portray itself to prospective investors as a profitable enterprise to the extent NoXeno relied upon HCRMG's sales history and product line in NoXeno's marketing materials.

80)     At all times material hereto, HCRMG emphasized to EcoNatura and NoXeno, and EcoNatura and Noxeno were otherwise aware, that Medterra was a preexisting client of HCRMG.

81)     Similarly, HCRMG emphasized to Medterra that EcoNatura was HCRMG's subcontractor and that any communications between Medterra and EcoNatura needed to be disclosed to HCRMG.

82)     Nevertheless, Medterra, EcoNatura and NoXeno eventually formed a new, competing business relationship from which HCRMG was excluded, and which was premised upon the continued utilization of HCRMG's proprietary CBD Cream formula under circumstances where Medterra, EcoNatura and NoXeno were aware that such continued utilization was unauthorized. Moreover, Plaintiff has been informed and

believes that EcoNatura has capitalized upon HCRMG's ideas for a CBD-based roll-on as well as a psoriasis cream by producing these items for sale to Medterra and other wholesale customers, the revenues from which are being used to solicit new investors for NoXeno, subsequent to the Defendants' exclusion of HCRMG from the parties' ongoing business relationship.

83)     Medterra, EcoNatura and NoXeno therefore engaged in unfair methods of competition, unconscionable acts or practices, and/or unfair or deceptive acts or practices in the conduct of a trade or commerce as prohibited by Florida Statutes §501.204(1).

84)     As a direct and proximate result of Medterra's, EcoNatura's and NoXeno's misconduct as described above, Plaintiff has suffered actual damages.

WHEREFORE, Plaintiff respectfully requests entry of a judgment against Medterra, EcoNatura and NoXeno awarding actual damages, injunctive relief, attorneys' fees and costs, pre- and post-judgment interest, and such other and further relief this Court deems just and proper.

## <u>COUNT IV – TORTIOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP</u>
### <u>(against EcoNatura)</u>

85)     Plaintiff hereby reasserts and realleges the allegations contained in paragraphs 1-57 as if fully set forth herein.

86)     At all times material hereto, HCRMG was a party to an ongoing business relationship with Medterra which relationship predated HCRMG's introduction to EcoNatura.

87)     Subsequent to its introduction to HCRMG, EcoNatura was made aware of

HIRZEL DREYFUSS & DEMPSEY, PLLC, 2333 BRICKELL AVENUE, SUITE A-1, MIAMI, FLORIDA 33129

HCRMG's preexisting business relationship with Medterra.

88)     Despite such awareness, EcoNatura proceeded to intentionally and unjustifiably interfere with the business relationship between HCRMG and Medterra by forming a competing business relationship with Medterra to the exclusion of HCRMG while using HCRMG's proprietary CBD Cream formula as well as HCRMG's concepts of a CBD-based roll-on and psoriasis cream.

89)     In connection therewith, EcoNatura refused to divulge to HCRMG the basis for the cost of producing the CBD Cream notwithstanding HCRMG's repeated requests for such information. This enabled EcoNatura to undercut the wholesale prices HCRMG was quoting to Medterra once EcoNatura successfully excluded HCRMG from doing further business with Medterra. EcoNatura furthermore divulged to Medterra, without prior authorization, HCRMG's profit margin with respect to the CBD Cream which caused additional damage to HCRMG's relationship with Medterra.

90)     Accordingly, EcoNatura's intentional and unjustified interference with HCRMG's business relationship with Medterra was done maliciously and in bad faith with the specific intent to cause harm to Plaintiff.

91)     As a direct and proximate result of EcoNatura's intentional and unjustified interference as discussed above, Plaintiff has suffered substantial damages.

WHEREFORE, Plaintiff respectfully requests entry of a judgment against EcoNatura awarding damages, pre- and post-judgment interest, and such other and further relief this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, HCRMG, hereby demands a trial by jury on all claims so triable.

HIRZEL DREYFUSS & DEMPSEY, PLLC, 2333 BRICKELL AVENUE, SUITE A-1, MIAMI, FLORIDA 33129

Respectfully submitted on this 3rd day of September, 2020.

HIRZEL DREYFUSS & DEMPSEY, PLLC
*Counsel for Plaintiff, HCRMG*
2333 Brickell Avenue, Suite A-1
Miami, FL 33129
Phone:  305-615-1617

By:  /s/  Leon F. Hirzel

**LEON F. HIRZEL** (Fla Bar No. 085966)
hirzel@hddlawfirm.com
**PATRICK G. DEMPSEY** (Fla Bar No. 27676)
dempsey@hddlawfirm.com
**ALEC P. HAYES** (Fla Bar No. 1015314)
hayes@hddlawfirm.com

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)* **NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.**

## I. (a) PLAINTIFFS

## DEFENDANTS

EcoNatura All Healthy World, LLC, Medterra CBD, LLC, Rejuvenol Laboratories, Inc., and Noxeno Health Sciences, Inc.

**(b)** County of Residence of First Listed Plaintiff
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Hirzel Dreyfuss & Dempsey, PLLC
2333 Brickell Avenue, Suite A-1
Miami, FL 33129 Tel: 305-615-1617

Attorneys *(If Known)*

**(d)** Check County Where Action Arose: ☐ MIAMI- DADE ☐ MONROE ☐ BROWARD ☐ PALM BEACH ☐ MARTIN ☐ ST. LUCIE ☐ INDIAN RIVER ☐ OKEECHOBEE ☐ HIGHLANDS

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government
      Plaintiff

☐ 3  Federal Question
      *(U.S. Government Not a Party)*

☐ 2  U.S. Government
      Defendant

☐ 4  Diversity
      *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff)*
*(For Diversity Cases Only)* and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729 (a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Personal Injury Product Liability | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | Liability | | ☐ 830 Patent ☐ 835 Patent – Abbreviated | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | | New Drug Application ☐ 840 Trademark | ☐ 460 Deportation ☐ 470 Racketeer Influenced and |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | Corrupt Organizations ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) ☐ 863 DIWC/DIWW (405(g)) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | Med. Malpractice | | ☐ 751 Family and Medical Leave Act | ☐ 865 RSI (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation ☐ 791 Empl. Ret. Inc. | | ☐ 891 Agricultural Acts ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | Security Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | or Defendant) ☐ 871 IRS—Third Party 26 | ☐ 899 Administrative Procedure Act/Review or Appeal of |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | **Other:** | | USC 7609 | Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 530 General ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 540 Mandamus & Other ☐ 550 Civil Rights | ☐ 462 Naturalization Application ☐ 465 Other Immigration | | |
| | ☐ 448 Education | ☐ 555 Prison Condition ☐ 560 Civil Detainee – Conditions of Confinement | Actions | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☐ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Re-filed (See VI below)  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district *(specify)*  ☐ 6 Multidistrict Litigation Transfer  ☐ 7 Appeal to District Judge from Magistrate Judgment  ☐ 8 Multidistrict Litigation – Direct File  ☐ 9 Remanded from Appellate Court

## VI. RELATED/ RE-FILED CASE(S)

(See instructions): a) Re-filed Case ☐ YES ☐ NO   b) Related Cases ☐ YES ☐ NO

JUDGE:   *SEE ATTACHMENT*   DOCKET NUMBER:

## VII. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C 1332; 28 U.S.C. 1367; 18 U.S.C. 1836(c): Defend Trade Secrets Act; Fla. Stat. 688.001: Fla. Uniform Trade Secrets Act; Fla. Stat. 501.201, Fla. Deceptive and Unfair Trade Practices Act
LENGTH OF TRIAL via _____ days estimated (for both sides to try entire case)

## VIII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23   DEMAND $   CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☐ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE
DATE   SIGNATURE OF ATTORNEY OF RECORD

**/s/ Alec P. Hayes, Esq.**

FOR OFFICE USE ONLY
RECEIPT #         AMOUNT         IFP         JUDGE         MAG JUDGE

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO.: 19-cv-81700-MIDDLEBROOKS**

HEALTHCARE RESOURCES
MANAGEMENT GROUP, LLC,

      Plaintiff,

      v.

ECONATURA ALL HEALTHY
WORLD, LLC, MEDTERRA CBD,
LLC, REJUVENOL LABORATORIES,
INC., and NOXENO HEALTH
SCIENCES, INC.,

      Defendants.

_____/

**ORDER**

THIS CAUSE comes before the Court upon Plaintiff Healthcare Resources Management Group,

LLC's "Pro Se Motion for Extension of Time to Obtain New Counsel," filed on May 18, 2020. (DE 51).

All Defendants have filed separate responses in opposition to the Motion. (DE 52; DE 53; DE 54; DE 55).

For the following reasons, the Motion is stricken, and Plaintiff's Amended Complaint is dismissed without

prejudice.

On April 24, 2020, Plaintiff's counsel moved to withdraw as counsel of record. (DE 44). I granted

the motion on April 27, 2020. (DE 45). In that Order, I recognized that because Plaintiff is an artificial

entity, it must be represented by counsel and is unable to proceed *pro se*. (*Id.* at 1). Plaintiff was provided

twenty-days to secure replacement counsel, meaning that replacement counsel was required to enter a

notice of appearance by May 18, 2020. (*Id.* at 2). Plaintiff was advised that "[f]ailure to obtain replacement

counsel by that day may result in dismissal of this action for failure to prosecute." (*Id.*).

On the deadline to obtain replacement counsel, Sam Genovese—the managing member of Plaintiff

Healthcare Resources Management Group, LLC—moved for an extension of time obtain replacement

counsel. (DE 51). Defendant MedTerra CBD initially argues that I should disregard this filing because

artificial entities must be represented by counsel.[1] (DE 54 at 1). I agree. As discussed, artificial entities may not represent themselves *pro se*. *See Palazzo v. Gulf Oil Corp.*, 764 F.2d 1381, 1385 (11th Cir. 1985) ("The rule is well established that a corporation is an artificial entity that . . . cannot appear *pro se*, and must be represented by counsel."). Accordingly, Genovese's Motion is a nullity and must be stricken.

Moreover, even if I were to reach the merits of the Motion, I would deny it for two reasons. As an initial matter, pursuant to S.D. Fla. Local Rule 7.1(a)(3), prior to filing any motion in a civil case, counsel for the moving party shall certify "that counsel for the movant has conferred with all parties or non-parties who may be affected by the relief sought in the motion in a good faith effort to resolve the issues raised in the motion and has been unable to do so." S.D. Fla. L.R. 7.1(a)(3). Plaintiff's Motion fails to include such a certification, which would be reason alone to deny the Motion.

More fundamentally, Defendant MedTerra argues and I agree that Plaintiff has failed to establish that despite its diligence, it could not comply with the deadline to obtain replacement counsel. The Scheduling Order, which encompasses other deadlines set throughout litigation, may be modified only "upon a showing of good cause." Fed. R. Civ. P. 16(b)(4). "This good cause standard precludes modification unless the schedule cannot 'be met despite the diligence of the party seeking the extension.'" *Sosa v. Airprint Sys., Inc.*, 133 F.3d 1417, 1418 (11th Cir. 1998) (citing Fed. R. Civ. P. 16 advisory committee's note).

The record here demonstrates that Plaintiff has been far from diligent in litigating this matter. Plaintiff first filed a motion to modify the scheduling order on February 5, 2020. (DE 8). Plaintiff initially requested the modification because its then counsel had a conflict with the August 17 trial date in this matter. I rejected this argument as premature. Additionally, I declined to extend any deadline within the Pretrial Scheduling Order because it failed to explain how Plaintiff had been diligently litigating this

---

[1] I focus on Defendant MedTerra's response because it succinctly captures all of the reasons why Plaintiff is not entitled to the requested relief.

matter. (DE 9). It similarly failed to describe any obstacles Plaintiff expected to encounter throughout discovery that would render the current litigation schedule impractical. (*Id.*). That order was entered on February 6, 2020, meaning Plaintiff has been on notice for over three months as to what it would have to establish to obtain an extension of any deadline in this matter.

Plaintiff subsequently filed two motions to extend the expert disclosure deadlines. The first motion was filed on March 9, 2020. (DE 31). At that time, Plaintiff's deadline to disclose expert witnesses was March 9, 2020. (*Id.*). Plaintiff's motion established that it had been able to retain all experts except for an expert on damages. (*Id.* at 2). It further established that it had been in talks with such an expert; however, the expert ultimately declined to represent Plaintiff, as he could not prepare the report under the current schedule. (*Id.* at 3). In light of these representations, I found good cause to grant a limited extension of the expert deadline. (DE 32).

On April 16, 2020, the Parties moved for a further extension of the expert disclosure deadlines. (DE 42). In light of the fact that the motion was filed by all Parties and they represented that the requested extension would not alter any other deadline in this litigation, I granted the motion. (DE 43).

In between the motions seeking an extension of the expert disclosure deadlines, Plaintiff filed a motion to vacate the Pretrial Scheduling Order and to reset the trial date. (DE 36). Plaintiff filed this motion even though it had been informed on multiple occasions that extensions of deadlines would only be granted if the moving party pleads specific facts demonstrating that despite its diligence, it could not comply with the current deadline(s). (*See, e.g.*, DE 9). Even with these warnings, Plaintiff's successive motion to vacate the Pretrial Scheduling Order did not sufficiently explain how despite its diligence, it was unable to comply with the deadlines. (DE 36). Instead, Plaintiff requested suspending all deadlines due to the business disruption caused by Covid-19. (*Id.* at 6). To its credit, Plaintiff provided some detail as to how the ongoing pandemic had affected its ability to litigate this matter. (*Id.* at 4). At the same time,

the motion failed to indicate why Plaintiff had not conducted the impacted discovery before the pandemic truly affected this country.

Even considering these deficiencies, I granted the motion in part. (DE 39). I declined Plaintiff's invitation to indefinitely suspend all deadlines in its ***own case.*** Instead, I granted an extension of the discovery deadline and the deadline to file dispositive motions. (*Id.*). This determination was based upon the fact that Plaintiff described how the ongoing pandemic had affected its ability to litigate this case. (*Id.* at 2). However, I cautioned Plaintiff that if it sought any further extension, it should be prepared to describe what actions were taken to complete the impacted discovery during the several months this case had been pending before Covid-19 impacted the United States. (*Id.* at 2-3).

Needless to say, this record demonstrates that Plaintiff has not diligently litigated this case. With this backdrop, I turn to the present Motion, in which Genovese (impermissibly) seeks an additional twenty-days to obtain replacement counsel. (DE 51). Genovese makes this request because he has been unable to secure replacement counsel due to disruption caused by Covid-19. Genovese states that it has been "diligently seeking representation from new counsel in, but due to several law offices being closed and the associated difficulty in contacting attorneys, Plaintiff has been unable to secure new counsel." (*Id.* at 1). Genovese further states that it recently contacted a law firm who is considering representing Plaintiff; however, that firm has not yet agreed to represent Plaintiff. (*Id.* at 2).

In response, Defendant MedTerra contends that Plaintiff's pandemic related arguments are "vague excuses for not being able to retain counsel." (DE 54 at 2). MedTerra specifically states that Genovese's "claim is disingenuous, as attorneys and staff across Florida continue to work remotely or, in some cases, continue to work from their offices." (*Id.*).

In light of the several instructions provided regarding obtaining extensions of time, I agree with MedTerra that Genovese fails to establish that he has diligently attempted to obtain replacement counsel. Plaintiff's then counsel moved to withdraw on April 24, 2020, meaning Genovese has known for at least

twenty-six days that he needed to obtain replacement counsel. Yet, aside from generally stating that law firms declined to represent Plaintiff due to the ongoing pandemic, Genovese fails to offer any specific details, *i.e.*, the number of firms contacted, when they were contacted, when they declined to represent Plaintiff, and why they declined. Genovese similarly fails to provide any information regarding the firm that is apparently considering representing Plaintiff. Thus, even if the present Motion were to be considered on the merits, it would be denied because the record demonstrates that Plaintiff has not diligently litigated this matter. And Plaintiff has not established that despite its diligence, it has been unable to timely obtain replacement counsel.

      Additionally, MedTerra's response to the present Motion establishes that Defendants would be prejudiced if any further extension is given. MedTerra specifically states that:

> the discovery cutoff in this case is less than a month from today. Plaintiff has failed to respond to MedTerra's discovery requests (originally due on April 2 but extended the first time through April 22, and the second time through April 29 by request of prior counsel), and Plaintiff has missed its deadline to designate an expert (May 15). Indeed, Plaintiff has not even produced its purported "proprietary formula" to any of the Defendants – the lynchpin of Plaintiff's case that gives rise to all of Plaintiff's claims. To permit Plaintiff another 20 days to retain counsel would cause extreme prejudice to Medterra, given the current pre-trial deadlines and upcoming August 17 trial date.

(DE 54 at 2-3).  This response further describes how Plaintiff has not diligently litigated this matter. Defendants should not be penalized for Plaintiff's dilatory conduct. Defendants are entitled to a timely resolution of this matter and given the posture of this case and the manner in which Plaintiff has litigated it, Defendants would be prejudiced if extensions are granted.

      Finally, because Plaintiff is an artificial entity which must be represented by counsel, I will dismiss the Amended Complaint for failure to prosecute. *See* Fed. R. Civ. P. 41(b); *see also Duong Thahn Ho. V. Costello*, 757 F. App'x 912, 914 (11th Cir. 2018) ("Although the plain language of Rule 41(b) indicates that a defendant may move for dismissal, a district court may *sua sponte* dismiss a case under the authority of either Rule 41(b) or the court's inherent power to manage its docket.").

Accordingly, it is **ORDERED AND ADJUDGED** that:

1. Plaintiff's "Pro Se Motion for Extension of Time to Obtain New Counsel" (DE 51) is **STRICKEN.**

2. Plaintiff's Amended Complaint (DE 5) is **DISMISSED WITHOUT PREJUDICE.**

3. The Clerk of Court shall **CLOSE THIS CASE** and **DENY AS MOOT** all pending motions.

**SIGNED** in Chambers in West Palm Beach, Florida, this 21st day of May, 2020.

DONALD M. MIDDLEBROOKS
UNITED STATES DISTRICT JUDGE

cc:    Counsel of Record;
Healthcare Resources Management Group, LLC
1288 NW 16 Street
Boca Raton, FL 33486